## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00243-APM** |
| **v.** | : | |
| | : | |
| **JOHN LOLOS,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant John Lolos (Lolos) to one month incarceration, and $500 in restitution.

### I.   Introduction

On January 6, 2021, Lolos participated in the attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.  The defendant stands before this Court to be sentenced on a misdemeanor conviction, but his conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for his actions alongside many others, the riot would not have delayed for several hours and threatened to derail altogether the Congressional certification of the 2020 Electoral College vote.

John Lolos (Lolos) has a history of violence. He was convicted of criminal harassment for loudly threatening to kill a woman, inside her office, and making repeated punching motions at

1

her face. The case was later dismissed, but only after, and apparently because, Defendant satisfied all the conditions of his probationary sentence, including community service, anger management classes, refraining from contacting the victim, and payment of a $500 fine. (Presentence Investigation Report (PSR), ¶ 31). Neither that experience nor his professional experience as the owner-operator of a security company that vows that it will "control who is allowed access to certain areas of your offices or corporate headquarters . . . we ensure that the right people have access to the appropriate parts of your building and grounds"[1] deterred his participation in the January 6 riot. Lolos came to D.C. and pronounced that he was about to "Storm the Capitol", which he did while climbing through a broken window in the Senate Wing. *See* ECF, 25 (agreed "Statement of Offense"), ¶¶ 13, 18.  After spending about forty-three minutes in the Capitol chanting at officers, and triumphantly waving his flags, he walked out of the Capitol yelling, "They left! We did it!", apparently excited that he participated in delaying the certification. Id., ¶ 17.

Lolos pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  For the reasons explained herein, the government requests a sentence of one month incarceration, and $500 restitution because: (1) a court previously sentenced Lolos to twelve months' probation for threatening to kill someone, but he still participated in the Capitol riot; (2) Lolos is the owner of a security firm which purports to protect properties and people, but he engaged in rioting and trespassing with others that endangered law enforcement officers and resulted in extensive property damage; (3) Lolos entered the Capitol through a broken window, with a balaclava that partially covered his face; (4) once inside, Lolos paraded through and remained in the Capitol for approximately forty-three (43) minutes chanting

---

[1] *See* https://americancorporatesecurityacs.com/office-security-and-monitoring/ as of October 17, 2021.

at U.S. Capitol police and waving his flags triumphally and only left the Capitol after he was confronted by heavily armed officers; (5) while leaving the Capitol, and after the certification of the 2020 Electoral College vote count was delayed, Lolos yelled and boasted "They left! We did it!"; and (6) Lolos's unruly conduct continued even after the riot when he was removed from a commercial passenger airplane because of repeatedly chanting, "Trump 2020!" while onboard and disturbing other passengers.

Lolos only expressed remorse for his actions after being charged and arrested in this case. Lolos's actions warrant a significant sentence involving confinement.

**II.    Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 25, at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. The sheer number of people who chose to be a part of this attack on democracy overwhelmed the Capitol despite valiant attempts by law enforcement officers to fight them off. Even those who did not attack others, destroy property, or threaten members of Congress themselves supported those who did by joining them. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). The presence and participation of each and every one of these people encouraged and enabled other rioters as they breached the grounds and the building.

*John Lolos's Role in the January 6, 2021 Attack on the Capitol*

Lolos traveled by airplane from Seattle, Washington to protest alleged voter fraud. *See* ECF 25 (agreed "Statement of Offense"), ¶ 8.  After attending the President's rally, Lolos walked with a crowd to the Capitol Building.  Id., ¶10.   As he continued his approached towards the Capitol, at approximately 2:12 p.m. EST, Lolos took the below photos showing the chaos that surrounded it, including people climbing on statutes.





        While outside the Capitol Building, Lolos sent several text messages to a friend, stating:

"Where [sic] storming the Capitol now"; "I'm there were [sic] storming the Capitol now";

"We're going in."  Id., ¶ 12.  He also texted the digital photograph below:



Lolos arrived at the Capitol and walked up the West Capitol steps where he observed tear gas in the air. *See* ECF 25, ¶ 11.  He saw a broken window and, with other rioters, crawled through the window and into the building. Id., ¶ 13.  As shown in the screen shot from CCTV

footage below, he wore a black balaclava that partially covered his face, joining a crowd of

rioters already inside of the Capitol who were confronting the U.S. Capitol Police.



While inside, Lolos chanted at the police with his fellow rioters, id., ¶ 14, as shown in the screen

shot of CCTV below:



Lolos proceeded to the Crypt, as shown in the photograph below, where he triumphally waved his flags, and chanted to protest "voter fraud."  Id., ¶ 15.; *see* two photographs below.





Lolos proceeded to the Hall of Columbus. There, confronted by a contingent of police officers in riot gear, Lolos finally left the Capitol building.  Id., ¶ 16.  Having accomplished his goal in joining other rioters to delay the certification, Lolos yelled, "They left! We did it!"  as he left the Capitol. Id., ¶ 17. While emerging from the Capitol, Lolos was captured in video, yelling and waiving his flag triumphantly:



4:20 PM · Jan 6, 2021 · Twitter for iPhone

Lolos later texted a photograph of himself to his friend with the caption: "Me after battle." Id., ¶ 18.



On January 8, 2021, Lolos was a passenger aboard a Delta airline flight on the tarmac of Ronald Reagan Washington National Airport. Lolos was disturbing other passengers on the airplane by continuously yelling "Trump 2020!" *See* ECF 1 (Criminal Complaint). Due to the continuing disturbance on the plane, the flight crew turned the airplane around, went back to the gate, and escorted Lolos off the flight. Id.  U.S. Capitol Police arrested Lolos on January 9, 2021 following issuance of a Complaint charging him with violation of 18 U.S.C. 1752 (a)(1), 18 U.S.C. 1752 (a)(2), 40 U.S.C. 5104(e)(2)(D), 40 U.S.C. 5104(e)(2)(G).

*The Charges and Plea Agreement*

On March 23, 2021, Lolos was charged by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On August 4, 2021, he pled guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). August 4, 2021 Docket Entry.  By plea agreement, Lolos agreed to pay $500 in restitution to the Department of the Treasury[2]. ECF 24.

### III.    Statutory Penalties

Lolos faces sentencing on a single count of violating 40 U.S.C.  § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.[3] PSR, ¶¶ 58, 70. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

---

[2] It has been determined that payment of restitution should be made to the Architect of the Capitol not the Department of Treasury.

[3] Because the defendant has pled guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this Class B misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, id.; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). As explained below, all the § 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was occupied by hostile participants. The attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, each person who unlawfully entered the Capitol on January 6 did so under the most extreme of circumstances. They would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with police officers and smelled chemical irritants in the air. No rioter was a mere tourist that day.

This Court should assess Lolos's conduct on a spectrum of the criminal conduct engaged in by the other rioters charged with misdemeanors. In determining a fair and just sentence on this

spectrum, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or encouraged violence; (3) whether the defendant engaged in any acts of destruction or encouraged destruction;[4] (4) the defendant's reaction to acts of violence or destruction by others; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements about the riot in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement officials; and (9) whether the defendant expressed sincere remorse for his conduct on January 6. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Knowing that he was about to illegally enter the Capitol, Lolos sent a text message to a friend proclaiming that he was "storming the Capitol" and at that "[w]e are going in." *See* ECF, No. 25, ¶ 12. He did so at approximately 2:50 p.m. by entering a broken window even as chaos surrounded him and tear-gas filled the air. *See* ECF, No. 25, ¶¶ 11, 13.

While there is no evidence that Lolos destroyed any property while on Capitol grounds, he certainly benefitted from his fellow rioters who overran police, breached the Capitol, and broke the window through which he entered the Capitol. As the owner of a security firm, Lolos knew that the scene at the Capitol warranted his immediate retreat from the violence, property destruction, and chaos that was transpiring.

---

[4] Had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Instead, Lolos crawled through a broken window, joined his fellow rioters, chanted at police, waved his flags, and remained in the Capitol for almost 45 minutes. Lolos finally left after he saw heavily armed officers in the Capitol. *See* ECF, No. 25, ¶¶ 13 - 16. To leave no doubt that his mission was accomplished, Lolos left the Capitol screaming to others, "They left! We did it!" Lolos apparently got the confrontation that he sought, and texted a friend, "[m]e after battle." *See* ECF, No. 25, ¶¶ 17, 18.

Two days later, enough time for Lolos to reflect upon his actions and exemplify remorse, Lolos boarded a plane to leave Washington, D.C. He was so disruptive on the plane, chanting "Trump 2020", that he was kicked off. *See* ECF, No. 1. Lolos's defiant and disorderly conduct was a fitting way to end his trip to D.C. Based upon the nature and the circumstances of this offense, there is a clear need for a sentence of incarceration in this matter.

## B. The History and Characteristics of the Defendant

Lolos is 48 years old and a resident of Lakewood, Washington. PSR, ¶ 40. As set forth in the PSR, on January 6, 2010 Lolos pled guilty to harassment in the King County Superior Court, King County, Washington for threatening to kill his victim. PSR, ¶ 31. The court's imposition of sentence was deferred and it placed Lolos on probation for 12 months, ordered him to complete 80 hours of community service, attend anger management classes, have no contact with his victim, and obtain a mental health evaluation. Lolos's case was dismissed on April 22, 2011, presumably after he completed the requirements of probation. PSR, ¶ 31.

Lolos owns multiple real estate properties and vehicles. He also has a significant net worth. PSR, ¶ 51.

Lolos has been the owner and manager of American Security Service in Seattle, Washington since 1999. PSR, ¶ 50. Lolos's background as a security professional made his

conduct on January 6th particularly egregious since he was engaged in precisely the kind of unlawful entry into a premises he was paid by others to prevent. (ECF, No. 25, ¶ 19).

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." Id. at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially

those who intend to improperly influence the democratic process—that their actions will have adverse consequences. There is possibly no greater factor that this Court must consider. To that end, a Twitter video of Lolos leaving the Capitol other rioters, and Lolos shouting "They left! We did it!" has approximately 6,500,000 views, with approximately 12,400 weighing in to "like" the video. *See* https://twitter.com/mattmiller757/status/1346944869588230144 as of November 10, 2021.

A strong sentence that includes incarceration would provide general deterrence for anyone who would applaud or possibly repeat Lolos's actions.

*Specific Deterrence*

Lolos previously served probation for threatening to kill someone. Yet, he participated in the riot and boasted about it. Anyone in Lolos's position, let alone a security professional, on the grounds of the Capitol would have understood that the Capitol and police were being overrun by a mob of rioters. Lolos's text messages and actions as he left the Capitol clearly demonstrate the need for specific deterrence in the form of a period of incarceration.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6th in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.[6]

---

[6] Attached to this sentencing memorandum, as Exhibit 1, is a table providing additional information about the sentences imposed on other Capitol breach defendants.

The misdemeanor defendants will generally fall on the lower end of that spectrum, but that in no way means that misdemeanor breaches of the Capitol on January 6, 2021 were minor crimes. A probationary sentence should not become the default.[7] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 (statement of Judge Lamberth: "I don't want to create the impression that probation is the automatic outcome here because it's not going to be."); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, the courts and the government have drawn meaningful distinctions between offenders based on their conduct and personal characteristics. Those who engaged in felonious conduct are generally more dangerous and should receive sentences of incarceration. Those who illegally entered the Capitol and engaged in aggravating factors merit serious consideration of institutional incarceration even if guilty of only a misdemeanor offense. Those who illegally entered but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement.

---

[7] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, which total only 5 out of more than 260 plea offers made to date, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

The defendant pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pled guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases

20

constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police, prompt acceptance of responsibility, and expressions of genuine remorse.

There are critical aggravating factors at issue in this case: (1) the defendant's serious criminal history; (2) photographing the rioters outside the Capitol and still going inside of the Capitol; (3) Lolos's text messages regarding his actions at the Capitol; (4) photographing himself in the Capitol during the riot; and (5) Lolos's actions that led to him being forcibly removed from a commercial flight.

The government is aware of four misdemeanant defendants who have been sentenced who have serious criminal histories comparable to Lolos. Those cases are *United States v. Robert Bauer and Edward Hemenway*, 1:21-CR-00049 TSC, *United States v. Michael Thomas Curzio*, 1:21-cr-00041 CJN, and *United States v. Karl Dresch*, 1:21-CR-0071 ABJ. These cases also contain some of the significant aggravating factors that exist in this case.

In the *Bauer and Hemenway* case, two cousins, Bauer and Hemenway, entered the Capitol together even though they saw a "Do Not Enter Sign", and officers in S.W.A.T. gear outside of the building, clearly indicating that they should not enter the Capitol. (*See* 1:21-CR-00049 TSC, Dkt. 26, at 8 (Hemenway Statement of Offense)). While inside the U.S. Capitol, Bauer and Hemenway chanted, "Stop the Steal!" Bauer also took pictures and videos in the Capitol, and chanted, "Our house! Our house!" *Id*. at 9. Hemenway has a serious criminal history, with a conviction for Sexual Battery and Criminal Confinement. (*See* 1:21-CR-00049 TSC, Dkt. 32, at 11 (Government's Sentencing Memorandum regarding Hemenway). Bauer has convictions for Operating a Motor Vehicle Alcohol-Drugs, Possession of Anhydrous Ammonia and Vandalism, Possession of Methamphetamine, Manufacturing Methamphetamine and related charges, and Unlawful Possession of Meth Precursor. (*See* 1:21-CR-00049 TSC, Dkt. 33, at 11 (Government's Sentencing Memorandum regarding Bauer)). The Government recommended a 30-day sentence

of imprisonment for both defendants. Instead, the Court sentenced them to 45 days imprisonment, 60 days of community service, and $500 restitution.

In the *Curzio* case, during the riot at the Capitol, defendant briefly entered the visitor center of the Capitol, but refused to leave after Capitol Police officers ordered defendant and a crowd to do so.   Defendant was charged with four misdemeanors, and pled guilty to Parading, Demonstrating, or Picketing in violation of 40 U.S.C. § 5104(e)(2)(g). The Court detained defendant pending sentencing, which amounted to almost 6 months of pretrial detention, leaving defendant only 2 days on his maximum term under Title 40 U.S.C. § 5104(e)(2)(g). The government requested a sentence of probation to allow supervision, but the Court sentenced defendant to 6 months incarceration, with credit for time served.  There also, defendant had a significant criminal history, a conviction for attempted first degree murder.

In the *Dresch* case, the defendant had convictions for fleeing and eluding arrest, disturbing the peace, permitting another to violate the motor vehicle code, and obstructing an officer. The Court detained defendant following his arrest on charges for his illegal conduct in the Capitol on January 6th.  Dresch entered the Capitol knowing that law enforcement was trying to repel rioters by using tear gas.  In response to a Facebook message that warned, "Word is police are getting ready to use tear gas," Dresch responded, "Been using it. Mask up." (*See* 1:21-CR-0071 ABJ, Dkt. 33 (Government's Sentencing Memorandum), at 7). Dresch also expressed satisfaction and enthusiasm regarding the events at the Capitol. On the night of January 6th, Dresch commented on a picture of a crowd at the Washington Monument, and posted, "Total Victory!" and, "I'm excited!" (*See* 1:21-CR-0071 ABJ, Dkt. 33, at 7-8). The Court in *Dresch* sentenced him to 6 months' incarceration.

23

The *Bauer/Hemenway, Curzio, and Dresch*, cases are analogous to the instant case, not only because each of those defendants had a significant criminal history.  One or more of those cases also presented some of the same aggravating factors as does this case, including defendants who, like Lolos: photographed rioters and were aware of the rioting outside the Capitol, but still went inside like Bauer and Hemenway; bragged through text messages or social media about storming the Capitol as did Dresch, and even sent photos of their illegal conduct like Bauer.

The final aggravating factor here is Lolos's actions that led him to get forcibly removed from a commercial flight day following the riot. While the government is unaware of any other Capitol riot defendant who did the same, Lolos's behavior on the plane revealed a lack of remorse for his actions in the Capitol. They also show his willingness to engage in reckless and confrontational conduct, actions the Court should consider in fashioning a sentence.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." Id. at 1095.

## V.     Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As described above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Lolos to one month incarceration, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:/s/ Anthony L. Franks
ANTHONY L. FRANKS
Missouri Bar No. 50217MO
Assistant United States Attorney
Detailee – Federal Major Crimes
United States Attorney's Office
for the District of Columbia
Telephone No. (314) 539-399
anthony.franks@usdoj.gov

</div>

## CERTIFICATE OF SERVICE

On this 10th day of November 2021, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<div style="margin-left: 40%;">

/s/ Anthony L. Franks
ANTHONY L. FRANKS
Assistant United States Attorney

</div>